# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 29, 2012 Session

## STATE OF TENNESSEE v. ALLAN POPE

**Appeal from the Criminal Court for Sullivan County**
**Nos. S58286, S58287      R. Jerry Beck, Judge**

---

### No. E2011-01410-CCA-R3-CD-FILED-OCTOBER 5, 2012

---

In presentments by a Sullivan County Grand Jury, appellant, Allan Pope, was charged with four counts of theft of services more than $1,000 but less than $10,000; one count of official misconduct; one count of using public equipment for private purposes; and one count of theft of services more than $10,000 but less than $60,000. A jury found appellant not guilty of all counts of theft of services more than $1,000 but less than $10,000. He was found guilty of the remaining counts. The trial court imposed a one-year suspended sentence for official misconduct and a three-year suspended sentence for theft of services more than $10,000 but less than $60,000 and placed appellant on probation for six years.[1] On appeal, appellant raises the following issues: (1) whether the trial court erred in denying appellant's motion for judgment of acquittal or motion for new trial; (2) whether the evidence was sufficient to sustain a conviction for official misconduct; (3) whether the evidence was sufficient to sustain a conviction for private use of county equipment; (4) whether the evidence was sufficient to sustain a conviction for theft of services more than $10,000 but less than $60,000, and; (5) whether the trial court erred in ordering restitution. Upon review of the record, we agree with appellant and conclude that the evidence was insufficient to sustain the convictions for official misconduct and private use of public property, therefore we reverse the judgments of conviction and dismiss those counts of the indictment. We affirm the judgment of the trial court on theft of services more than $10,000 but less than $60,000 and remand the matter for entry of judgments consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed and Dismissed in Part; Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

---

[1] The judgment form pertaining to the charge of private use of county equipment does not indicate the length, manner, or percentage to be served of the sentence.

Dan R. Smith, Johnson City, Tennessee (on appeal); Ricky A. W. Curtis and Teresa Murray Smith, Blountville, Tennessee (at trial) for the appellant, Allan Pope.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts

This case involves the alleged misconduct of Appellant Allan Pope, the elected highway commissioner of Sullivan County, with respect to projects under his supervision. The State presented the facts of this case to the jury according to allegations pertaining to a particular piece of property. For ease of reference, this court will recount the facts and group them accordingly. Some testimony is more general in nature, and thus is set forth first.

A. General Trial Testimony

Special Agent Brian Pritchard with the Tennessee Bureau of Investigation ("TBI") testified first for the State. He stated that the District Attorney General for Sullivan County contacted him in March of 2010 and requested that he initiate an investigation into various activities of the Sullivan County Highway Department. The district attorney specifically requested an investigation into the digging of a ditch on Graybeal Road in the Bluff City area of Sullivan County. Agent Pritchard also investigated work that the highway department performed on Hawley Road, on two areas of Rice Cross Road, and on Muddy Creek Road, all in Sullivan County.

During the course of his investigation, Agent Pritchard spoke with "dozens" of individuals. He also fielded various anonymous complaints against the highway department. He reviewed financial disclosure forms and learned that none of the property owners involved had donated money to appellant's campaign. However, Agent Pritchard believed that information to be "outside the scope" of and not pertinent to his investigation. Although Agent Pritchard reviewed the records at the election commission office, he did not ask the property owners if they had contributed less than $100 to appellant's campaign fund, which would not require reporting.

On cross-examination, Agent Pritchard admitted that he did not personally view any of the properties in question before any work began. He relied on the "before" and "after" pictures provided to him by James "Jim" Montgomery at the highway department. He acknowledged that variations in the camera angle could cause pictures to appear different even though they are the same image.

As part of his investigation, Agent Pritchard formulated estimates of the work performed at each location. According to Agent Pritchard, the highway department kept limited files pertaining to projects. To gather the information necessary to assemble an estimate, he interviewed people who actually worked on the jobs, along with their supervisors.

Michael Joe Cunningham testified that he was a salesman at Stowers Equipment Rentals. Stowers had previously provided rental equipment for the county highway department at a negotiable rate. The State introduced a list of rental rates for 2007-2008 through Mr. Cunningham.

The State tendered Larry Bailey, the Director of Accounts and Budgets for Sullivan County, as an expert in state and county auditing procedures and the trial court allowed him to testify in that regard. He testified that the Tennessee County Uniform Highway Law was enacted by the legislature in an attempt to regulate the duties, responsibilities, procedures, and salary range for county highway department personnel. The statute refers to the "chief administrative officer" of the department, the title held by appellant. The highway commissioner does not have the authority to perform work on private property except for bus or postal route turn-arounds. The commissioner can perform work for other jurisdictions, but the work is subject to county commission approval and reimbursement by the recipient city or county. The Sullivan County Commission never approved a resolution for the Sullivan County Highway Department to perform work for Bluff City.

Mr. Bailey's department was also responsible for payroll for county government employees and for paying bills incurred by the county. His office paid a bill in the amount of $3,525 to Stowers Equipment Rental and Supply for rental of a bulldozer in November 2006. The bill was incurred during the project at Muddy Creek Road. Mr. Bailey stated that when an auditor reviewed county records, the auditor would ensure that the bills or invoices were signed by the proper individuals and that the paperwork was in order. Unless someone reported that a particular item was used in an improper fashion, auditors would not have the "field" experience to notice an improper purchase or allocation. The auditors only confirmed that the office implemented proper controls. If an auditor found an impropriety in the records of a county department, the auditor completed an audit report and directed it to the district

attorney general of the county. In conducting the Sullivan County audit in 2007, Mr. Bailey found no improprieties.

Mr. Bailey confirmed that appellant had the authority to act upon Sullivan County property or property over which the county exercised a right-of-way. Appellant also had the authority to remove obstructions along the rights-of-way. Mr. Bailey was not certain about the highway supervisor's discretion to remove obstructions on private property outside of the exceptions he noted. He testified that the statutory provision that addresses misuse of property or funds provides that the supervisor should be immediately discharged in the event of proof of improprieties.

Gary Wayne Medlin, a lieutenant with the Sullivan County Sheriff's Office, reviewed dispatch records from the sheriff's department from January 1, 2003, through December 31, 2007, at the State's request. He specifically focused on five locations: from 1000 to 1100 Hawley Road; 964 Rice Cross Road; 1200 Rice Cross Road; the intersection of Muddy Creek Road and Hawley Road; and the intersection of Muddy Creek Road and Brown Circle. The only incidents he located were at the two intersections joining Muddy Creek Road. He reported five dispatches to the Muddy Creek Road/Hawley Road intersection and six dispatches to the Muddy Creek Road/Brown Circle intersection. None of the traffic accidents were attributed to sight distance problems, with the exception of one. One incident at Muddy Creek Road and Brown Circle was reportedly caused by the sun setting in the driver's eyes. The records reflected a single-car accident resulting in a roll-over prior to the date the work was completed on the slope, but no single-car accidents had been reported after the work was finished. Lieutenant Medlin's information did not contain details of how many "close calls" may have occurred at the locations or how many complaints the department may have received about the lack of safety at the locations.

Jim Montgomery testified that he had been employed by the Sullivan County Highway Department for thirty-one years. He was the surveyor for the highway department and assisted with the department's budget and finances. He had an assistant named Mike Betley. Before appellant began his tenure as highway commissioner, David Campbell was a roller operator on the county's paving crew. Appellant promoted Mr. Campbell to section foreman. The county was divided into four sections with a section foreman assigned to each one. Mickey Nottingham was a construction foreman. He would perform certain jobs at the request of section foremen or the county road supervisor. After appellant took office, Mr. Montgomery started keeping duplicate copies of certain files in his office.

When a project involved operating beyond the county's right-of-way, the highway department would obtain an easement from the property owner. Mr. Montgomery prepared the easements prior to appellant's taking office. The department secretary, Peggy Campbell,

wife of David Campbell, wrote most of the easements from that point forward. She was not employed by the highway department until appellant began his tenure.

Appellant testified at trial. He became the highway commissioner in 2006. Pursuant to the Tennessee County Uniform Highway law, highway commissioners must be qualified before they can run for the office. His background included construction, civil engineering, and construction engineering. Appellant thought that he would be working in the field, surveying land and designing. He did not realize that the position would entail more management than anything else.

The highway department had 141 employees when appellant took office. The county was subdivided into four sections, with a foreman assigned to each section. The foremen assigned by appellant were John Salyers, David Campbell, Scotty Murray, and Terry Schaffer. The highway department was responsible for all county roads, bridges, rights-of-way, and utility rights-of-way. The department was also responsible for safety, which entailed maintaining traffic signals, mowing, ditching, and shouldering (to prevent hydroplaning). It paved roads and installed road signs, as well.

When appellant took office, he immediately demoted all of the previous foremen and promoted his own men, including David Campbell, to the positions. He also hired Peggy Campbell, Mr. Campbell's wife, as the department secretary.

In deciding whether to correct the various sight distance problems, appellant did not contact the sheriff's office to ascertain whether their records reflected complaints or traffic accidents. As chief administrative officer of the highway department, appellant felt that it was within his discretion to perform the work. He stated that if he, in his judgment, thought it was necessary, then it was necessary.

J. Rodney Carmical was the executive director of the Tennessee Highway Officials Association. In that capacity, he worked for the elected and appointed road superintendents. He provided technical assistance and training opportunities; monitored pertinent state and federal legislation; attended meetings; circulated a newsletter; and monitored the General Assembly.

Mr. Carmical was familiar with the highway department laws. The procurement of easements over private property is covered by the Tennessee statutes. The reasons for obtaining an easement are: (1) to gain control over the subject property; (2) to work on "county" rather than "private" property; and (3) and to insulate the department from liability. Because the highway department cannot perform work on private property, it is allowed to obtain easements so that it can make problems on private property safe for citizens. Further,

the highway department has total control over line of sight problems, including sloping banks and cutting brush to enable better sight clearance.

## B.  Graybeal Road

Agent Pritchard testified first regarding the ditch on Graybeal Road that appellant authorized his crew to dig.  Graybeal Road is a cul-de-sac with three houses located at the end of it.  Those houses are serviced by a private water line that runs to the main line supplied by Bluff City.  Agent Pritchard photographed the ditch while it was in the process of being dug and after it had been filled in and graded.  He did not notice any indication of an eighteen-inch drainage ditch being created along the road.  The ditch he witnessed appeared to be much deeper than that.  Agent Pritchard photographed a pick-up truck, owned by Joe Wilkinson, with PVC pipe on a trailer behind it.  Agent Pritchard prepared his own cost estimate of the work performed on Graybeal Road, factoring in the salary rates of county employees, the hours spent on the job, and the cost of the equipment.  He estimated that the project cost Sullivan County $4,550.54.

Joe Wilkinson, a grading contractor from Bluff City, testified that someone contacted him on behalf of Reed Booher and requested that he bid on a project to install a water line off of Graybeal Road where Mr. Booher was developing land.   Mr. Wilkinson believed the person who contacted him was Bud Davies, the surveyor.  Mr. Wilkinson submitted a bid for the water line from the start of Graybeal Road to the back of it around October or November of 2009.  The proposal of $2 per foot of water line involved Mr. Booher purchasing all of the parts and Mr. Wilkinson digging and installing the line.  Mr. Wilkinson went to the area in February or March of 2010 because Bluff City was installing a line under the road to a main line.  At that time, he noticed a couple of county trucks, an excavator, and a road grader.  He saw an open ditch of approximately 1,000 feet long, as well.  Mr. Wilkinson and Mr. Booher reached an agreement around the first of March, 2010, for Mr. Wilkinson to proceed with installing the two-inch water line.  Mr. Booher paid for the pipe, and Mr. Wilkinson picked it up in Blountville.  He traveled to the location with the pipe on a Friday morning.  When he arrived, the ditch had been completely covered and graded back as though it had never existed.  Mr. Wilkinson had to re-dig the trench so he could install the water line.  He installed six-inch pipe instead of two-inch pipe, which raised the price from $2 to $3 per foot.  He installed close to 2,000 feet of water line.  During this time, Mr. Wilkinson never had a conversation with anyone from the city of Bluff City.

Anthony Todd Malone was the mayor of Bluff City in March 2010.  He also performed the duties of city manager for a period of time.  As city manager, he directed the daily activities of the city government, including supervision of personnel.  As mayor, he attended meetings with the aldermen to discuss city resolutions and ordinances.  Bud Davies,

a surveyor, approached Mr. Malone, in his capacity as mayor, in October or November, 2008, with a request that Bluff City install a water line and supply water to a planned housing development for approximately sixteen houses on Graybeal Road. Mr. Davies made the request on behalf of the property owner, Reed Booher. Mr. Davies stated that if Bluff City would supply the pipe, install the pipe, and supply the water, the Sullivan County Highway Department would open and close the ditch. In March of 2010, the city board decided that Bluff City would supply the water after the developer installed the water lines. Mr. Malone never had direct contact with anyone from the Sullivan County Highway Department.

Mayor Malone testified that on any occasion Bluff City and Sullivan County collaborated on a project in Bluff City, the two entities entered into an agreement. He spoke with appellant once during a previous transaction but not during the proposed digging of the ditch on Graybeal Road.

William John McKamey testified that he was a Sullivan County commissioner in January of 2010. That month, he, Don Weaver, appellant, and David Campbell met over lunch. Don Weaver was the city manager of Bluff City. David Campbell was the section foreman for the Bluff City area. The purpose of the meeting was to negotiate the sale of road salt to Bluff City by Sullivan County. Bluff City ran out of salt that winter due to large amounts of snow. They did not discuss the water line project on Graybeal Road.

Frederick "Don" Weaver was the city manager for Bluff City at the time of appellant's trial. He began his employment in December 2009. In his capacity as city manager, Mr. Weaver attended the January 2010 lunch meeting regarding the purchase of road salt from Sullivan County. He never had a conversation with anyone from Sullivan County about digging the ditch on Graybeal Road.

James Allen Carr was employed by the Sullivan County Highway Department. He was a track hoe operator. Appellant and David Campbell instructed him to go to the Graybeal Road area and dig a ditch. The purpose of the ditch was for a water line. Aside from the Graybeal Road project, Mr. Carr had never been asked to dig a water line ditch during his thirty-six years of employment with the highway department. He had, however, dug several drainage ditches. The request caused him some concern. Mr. Carr explained to appellant and Mr. Campbell that he did not think they should dig the water line ditch until Sullivan County obtained more information about the project. Appellant told Mr. Carr that Bluff City was going to install the water line. Mr. Carr dug the ditch as instructed, but no one installed the water pipe. The ditch was three feet wide, three feet deep, and three to four hundred feet long. Mr. Carr believed that it would serve the dual purpose of containing water pipe and providing drainage. The Friday morning after Mr. Carr completed digging, Mr. Campbell instructed him to fill the ditch at appellant's request because the water line was not

going to be installed. Eddy Murray was present during the filling of the ditch to flag vehicles for safety; however, Mr. Murray was not present during the digging of the ditch. No one watched Mr. Carr dig the ditch, but several people watched him cover it back up.

Agent Pritchard testified that he arrested appellant on July 21, 2010. After Agent Pritchard informed him of his *Miranda* rights, appellant agreed to speak with him. Appellant gave a statement in which he told Agent Pritchard that during the process of widening Graybeal Road, he was "pretty sure" that Reed Booher talked to David Campbell. Mr. Campbell indicated to appellant that he knew Mr. Booher. Appellant, Mr. Campbell, and Mr. Booher met to discuss widening the entrance of Graybeal Road. Appellant advised Mr. Booher that the county could perform the work if it had the right-of-way. Appellant and Jim Montgomery checked the file on Graybeal Road and confirmed that the county had a fifty-foot right-of-way. Mr. Montgomery marked the right-of-way with stakes and they began the process of widening the road.

In his statement, appellant further said that on another occasion, he met Mr. Booher on Graybeal Road and asked if Mr. Booher had contacted Bluff City; Mr. Booher responded in the affirmative. Believing that Bluff City would want to install a new water line at approximately the same time Sullivan County finished paving the road, appellant suggested that Mr. Booher communicate to Bluff City that Sullivan County would dig the ditch for the water line if Bluff City would provide the labor and materials for the line. At that time, appellant asked Mr. Booher for a right-of-way for a cul-de-sac at the end of the road, to which Mr. Booher agreed.

Appellant further stated to Agent Pritchard that he heard nothing more of the project until January 2010, when Commissioner John McKamey called David Campbell and asked to have lunch with Mr. Campbell and appellant. Don Weaver from Bluff City was also to attend. During the lunch at the Ridgewood restaurant, appellant told Don Weaver about possibly digging the water line ditch on Graybeal Road in the near future. Appellant told Mr. Weaver that it would save Bluff City a great deal of money. Mr. Weaver stated that Bluff City appreciated all of the support that it received from the Sullivan County Highway Department. Appellant believed that at the time of the lunch meeting, Bluff City had already decided to forgo the project on Graybeal Road and that the meeting would have been the appropriate time for Mr. Weaver to inform him accordingly. In March, 2010, after digging a portion of the water line ditch, Sullivan County Highway Department learned that Bluff City was not going to participate in the project. Mr. Booher was going to hire a private contractor to install the water line. Appellant advised Mr. Campbell to fill in the ditch. Leaving an open ditch over a weekend violated the Occupational Health and Safety Act (OSHA) standards.

Mr. Montgomery testified with regard to the work the highway department performed on Graybeal Road. He stated that the Graybeal Road project was divided into two segments. The first segment involved widening the road and creating a cul-de-sac at the end of the road. The second part of the project involved digging the water line ditch. Mr. Montgomery was familiar with the first segment of the project but was out of town when workers were digging the ditch. He was familiar with the proposal regarding the water line ditch because he was present when Bud Davies, a private surveyor working with Reed Booher, came into the highway department office and asked if Sullivan County would dig the water line ditch if Bluff City agreed to install the water line.

Mr. Montgomery and appellant were in Murfreesboro, Tennessee, for a conference when appellant received a telephone call from David Campbell about the water line. Appellant advised Mr. Campbell to proceed with the project. Later, Mr. Montgomery learned that the property owner was going to hire a private contractor to install the water line. Mr. Montgomery's only involvement in digging the water line ditch was advising appellant that he should obtain approval by the Sullivan County Commission before entering into an agreement with another governmental entity. According to Mr. Montgomery, appellant did not treat the Graybeal Road project any differently than he had any other project. Appellant did not attempt to or request Mr. Montgomery to hide the specific costs of the project and did not advise Mr. Montgomery to keep the details of the project quiet.

Appellant testified at trial that in 2010 he authorized the project at Graybeal Road. The county had a right-of-way, and the road was very narrow. Beside the road, three water lines ran at a depth of approximately one foot. The county workers kept breaking the lines with the lawn mowers and having to patch them. Appellant was on site inspecting the shallow water lines. He later spoke with Reed Booher about widening the road. Appellant said that the county would widen the road if it had a right-of-way. Jim Montgomery confirmed that the county had a right-of-way at that location, so the county widened the road.

While the crew was widening Graybeal Road, appellant saw Reed Booher on site. Seeing Mr. Booher led appellant to think that Bluff City would likely be installing new water lines the area. He had worked with Bluff City two times previously. Bluff City visited the area to perform a water tap. Appellant expected that the water lines would be installed next. Based on his experience with Bluff City, appellant authorized his department to dig the water line ditch.

Appellant testified that he was in Murfreesboro when he learned that Bluff City would not be installing the water line. He instructed Mr. Campbell to close the ditch. The Occupational Health and Safety Administration (OHSA) prohibited a open ditch from being left unattended over a weekend. In offering to dig the water line ditch, appellant did not

receive any favors or benefit from Mr. Booher. He did not know Mr. Booher prior to this project.

Appellant further testified that he did not think that he needed county commission permission to dig a utility ditch for another municipality if it was located on the county's right-of-way. He felt that he, as commissioner, exercised absolute authority over the rights-of-way. In fact, utilities would have to seek his permission before the company could do work on the county right-of-way. During the pendency of the project, no one from Bluff City ever told him that it would not install the water lines. Appellant further believed that the statute authorizing the department to perform work for another municipality did not specify whether the county commission must give prior approval or whether subsequent approval was sufficient.

## C. Hawley Road

Because appellant was acquitted of the charge associated with the project on this property, we will briefly recite the facts associated with the transaction for the record.

Agent Pritchard presented photographs he obtained from the county highway office of the property on Hawley Road belonging to the Garst family. The "before" photographs depicted different camera angles of a curve in the road and a slight grade in the land adjacent to the road. One picture showed a "sharp curve" sign on the road. The "after" photographs showed how the grade had been minimized into a gentle slope, seeded, and covered with straw. Agent Pritchard testified that he did not see a significant difference in the slope between the "before" pictures and the "after" pictures.

Julia Garst testified that she lived with her parents, Wilber and Christina Garst, on her family's farm located at 1007 Hawley Road. She testified that a highway department representative informed her that the department wanted to grade a slope on their property located within a curve in the road. Her ninety-seven-year-old father continued to drive his tractor, and she would have worried about him driving on Hawley Road prior to the bank being graded. The Garst family did not pay appellant for the work, and Ms. Garst could not think of any benefit that appellant would have received as a result of the project.

## D. 1200 Rice Cross Road

Because appellant was acquitted of the charge associated with the project on this property, we will briefly recite the facts associated with the transaction for the record.

Agent Pritchard visited property located at 1200 Rice Cross Road, owned by Jeff Boling. He identified a series of pictures designated as "before" pictures and "after" pictures. The "before" pictures indicated heavy brush on Mr. Boling's property. The "after" pictures showed that the brush had been cleared and the slope had been graded. The grading went past the county's right-of-way. Agent Pritchard did not believe that the bushes in their previous condition posed a visibility issue with respect to oncoming traffic and believed the work to be cosmetic in nature.

Jeff and Tracey Boling owned the property on Rice Cross Road. Mr. Boling testified that he had a steep slope on his property along the road that was difficult to cut with his weed-eater. On advice of a friend, he called Mr. Campbell at the highway department and learned that the county would perform work on their right-of-way, which extended thirty feet from the center of the road. Mr. Boling marked the thirty-foot distance on his property. Mr. Boling testified that his neighbor walked over to see what work was being done. The neighbor had bushes on his steep slope; he planted them because weed-eating became tiresome. Mr. Boling's neighbor told him that as long as the slope was on the county right-of-way, he should ask the track hoe operator to grade the slope on his property as well and remove the bushes. The track hoe operator also cleared the bank of Mr. Boling's other neighbor without a request.

### E. 964 Rice Cross Road

Because appellant was acquitted of the charge associated with the project on this property, we will briefly recite the facts associated with the transaction for the record.

The next pictures identified by Agent Pritchard involved property owned by W.A. Cross located at 964 Rice Cross Road. The county cleared a wooded section on Mr. Cross's property. Agent Pritchard did not think that the woods posed a visibility problem to drivers on the road. Although there was a curve in the road, he noted that a driver could see adequately. He also did not see a noticeable difference between the "before" pictures and the "after" pictures.

William Anderson Cross testified that he resided at 964 Rice Cross Road. In October 2007, at his request, the county performed some work on adjacent property. Mr. Campbell fixed the property to Mr. Cross's liking. The work performed by the county was on the right-of-way.

## F. Muddy Creek Road

The final piece of property Agent Pritchard investigated was on Muddy Creek Road and owned by William and Mary Louise Cartwright. The property was close to the intersection of Hawley Road and Muddy Creek Road. A portion of the property in question was sold to James Paul Darnell. The "before" pictures showed a bank on the side of Muddy Creek Road as the road began an uphill grade. Agent Pritchard testified that if a driver were at the stop sign on Hawley Road, pulling onto Muddy Creek Road, he could easily see to the left, to the top of the hill, as well as to the right.

The work extended around the property to the side adjacent to Hawley Road. The highway department graded the slope, seeded it, and covered it with straw. Agent Pritchard did not believe that a driver could see any farther after the work was done than before. Agent Pritchard obtained a copy of an easement relating to the property owned by the Cartwrights, as well as a real estate contract and a warranty deed to James Paul Darnell.

As part of his investigation, Agent Pritchard collated the information he gathered from interviewing the property owners, then visited various private construction companies to obtain an estimate of the number of hours and equipment needed to perform the work. For the project on Muddy Creek Road, he received the following estimates: $129,008 from Riggs Brothers Construction Company and $155,760 from Vic Davis Construction Company. Agent Pritchard's own estimate was $20,963.20 for the project.

Mary Louise Cartwright testified that she and her brothers inherited the farm located on Muddy Creek Road following the death of her mother in 2002. She moved to Knoxville to attend college and did not return to the home on Muddy Creek Road. Her brother Bill lived in Arizona, and her brother Dick still lived in the area. In 2006, the siblings reached an agreement dividing the farm among themselves. Dick Cartwright received a parcel of land on one side of Muddy Creek Road, while Bill Cartwright and Mary Louise Cartwright received two parcels on the opposite side of the road. The same year, Paul Darnell contacted Ms. Cartwright about purchasing her parcel, but as the conversation continued, he became interested in both her parcel and the parcel owned by Bill Cartwright. Mr. Darnell owned a development, Barefoot Landing, that abutted her parcel. Ms. Cartwright quoted Mr. Darnell a price of $790,000 for both parcels of land. They reached an agreement on November 22, 2006.

While they were in negotiations, Ms. Cartwright received a telephone call from someone with the highway department about the property where Brown Circle joined Muddy Creek Road. The individual explained that the department was concerned about the safety of the curve. Because they were actively involved in negotiations, Ms. Cartwright called Mr.

Darnell to obtain his approval. He agreed that the intersection was unsafe, so Ms. Cartwright signed the easement form provided to her by the highway department. She was not present during any of the land improvements performed by the highway department. The parties closed the real estate transaction on January 31, 2007.

Ms. Cartwright further testified that Jack Lawson from the economic development board wrote a letter to her expressing an interest in purchasing a portion of the land. Ms. Cartwright did not believe it was in her best interest to divide the property for sale. She spoke with Mr. Lawson in September 2006. During the conversation, Mr. Lawson again indicated a desire to purchase a portion of her property and also stated a concern about the line of sight distances at Hawley Road and Muddy Creek Road.

James Paul Darnell, who purchased the land from Bill and Mary Cartwright, testified that he was a developer in Sullivan County. He developed a subdivision called Barefoot Landing located along Brown Circle. Appellant performed the survey work for Mr. Darnell with respect to the development. He knew appellant and considered him a friend. Mr. Darnell also felt that appellant had always treated him fairly. Mr. Darnell had no reservations about the highway department working on the part of the Cartwrights' property that he wanted to purchase. He believed that it was a dangerous area because of overgrowth of plant life.

Mr. Darnell further testified that during the course of the project, the highway department removed dirt from the work site and delivered it to Mr. Darnell's development at Barefoot Landing. He agreed that the work that the county performed increased the value of his land because Mr. Darnell did not have to bear the responsibility of grading two clay banks on either side of the entrance to his subdivision. However, he believed that the work also improved the safety of the intersection. Mr. Darnell subsequently divided the property he purchased from the Cartwrights and sold a lot to another individual for $33,500. He did not think he would have gotten that price had the work not been completed by the highway department. Contractors built forty homes in Barefoot Landing. The only egress point from the subdivision was via Brown Circle to Muddy Creek Road. Mr. Darnell stated that the intersection was quite congested. Mr. Darnell never told appellant that he was interested in purchasing the property from the Cartwrights. He never asked appellant to perform the work on the property.

James "Mickey" Nottingham offered testimony with regard to the highway department's project on Muddy Creek Road. He served as foreman at the site. The project lasted approximately six weeks, from November through December 2006; the county completed additional work in March of 2007. Johnny Crain, Donny Faulk, Anthony Holoman, Joseph Hughes, Bryant Noe, Ronnie Richards, Gary Wilson, and James Carr also

worked on the project. The crew utilized two county bulldozers and rented one additional bulldozer. The project also required two trackhoes, a rubber-tired backhoe, a road grader, and four dump trucks. Mr. Nottingham recounted that the crew sloped the banks and installed a shoulder on the road and performed the work pursuant to David Campbell's instructions as section foreman. Mr. Nottingham was told that they were improving the road because of sight distance problems. Before the crew began work, Jim Montgomery marked the right-of-way with stakes. Mr. Nottingham was under the impression that the crew would be working only in the marked area. However, the grading of the slope extended beyond the right-of-way. Appellant visited the site every few days or once a week. Mr. Campbell was present nearly every day. Paul Darnell visited once a week, as well. Mr. Nottingham did not think that Mr. Darnell's presence was unusual because he heard that Mr. Darnell was interested in purchasing the land.

The crew removed dirt during the grading process and delivered it to the development at Barefoot Landing. Mr. Nottingham was not aware that Mr. Darnell owned the development. He testified that when the highway department has excess dirt from a project, they try to dispose of it at the closest possible location to minimize fuel costs. When the crew returned to sow and seed the banks in March 2007, Mr. Darnell was present on the land with logging equipment. The Environmental Protection Agency (EPA) required that the highway department sow and seed banks on the sides of roads to prevent run-off and soil erosion. The highway department was responsible for cleaning up any mudslides or erosion onto the road way.

Johnny Lee Crain was an employee of the Sullivan County Highway Department. His foreman was Mickey Nottingham. Mr. Crain's responsibilities included operating a bulldozer, a backhoe, a trackhoe, and other heavy equipment. He was involved in the project at Muddy Creek Road, operating the bulldozer to strip, stock-pile, and haul off the top soil. During the project, one of the highway department's bulldozers broke down, so they had to rent the equipment to complete the job.

While on the job site, Mr. Crain saw Paul Darnell four or five times. David Campbell was also present occasionally. Appellant visited the project location on the day that Stowers Equipment Rentals delivered the rental bulldozer. As he was working, Mr. Crain thought that the crew could have done less work to accomplish the end result; however, the majority of the work was necessary. In his experience, Mr. Crain had never worked on a piece of property that was going to be developed for residential lots. In his thirty-eight years with the highway department, he never dug a water line for a private developer.

Sherry Lynn Tipton was the office manager at Riggs Brothers Construction. Part of her responsibilities included preparing estimates for grading, excavating, and preparing sites

for construction. Agent Pritchard requested Ms. Tipton to prepare an estimate for the cutting and grading of an embankment that would take approximately four weeks. Using specific information provided by Agent Pritchard, Ms. Tipton estimated the project would cost $129,008.

Appellant told Agent Pritchard that David Campbell first spoke with him about the Muddy Creek Road project. Together they visited the intersection of Hawley Road and Muddy Creek Road. Appellant determined that there was "definitely" a sight distance problem at the intersection. He advised Mr. Campbell to find out who owned the property and ask if they would sign a temporary construction easement to grade the bank. Mr. Campbell then showed appellant the area of Brown Circle and Muddy Creek Road. Appellant agreed with Mr. Campbell that the area posed a sight distance problem, in light of the heavy traffic in the area. Mr. Campbell reached Mary Cartwright, who agreed to sign the construction easement. Appellant dispatched Mickey Nottingham's construction crew to grade the banks. The highway department received several positive comments from people in the community regarding the project. He never spoke with Paul Darnell and did not know if Mr. Campbell had. To the best of his knowledge, Mr. Campbell did not know that Ms. Cartwright's land was for sale when he spoke with her. Appellant advised Mr. Campbell to begin work on the project. However, appellant and Mr. Nottingham spoke about the job and agreed that they needed to blend the two projects or the land would look strange.

In the fall of 2006, Mickey Nottingham requested Jim Montgomery to mark the easement of Brown Circle with stakes so the highway department could correct a sight distance problem at the intersection of Muddy Creek Road. Mr. Montgomery noted that one could not see around the curve on Muddy Creek Road when stopped at the stop sign at the end of Brown Circle. He marked a 350 to 400 foot strip of the easement. He confirmed with Mr. Nottingham that the project would not extend past that point. He was aware of the complaints about sight distance problems that had been lodged over the years, though prior commissioners chose not to act on the complaints.

As the project was underway, Mr. Montgomery made a site visit and approached the area from Hawley Road. He could see a member the highway department crew operating a track hoe beyond the boundary he had marked. He took photographs of the sight clearance at the intersection of Hawley Road and Muddy Creek Road, as well as photographs of the track hoe's location. While he felt that the original area he marked should be graded, Mr. Montgomery did not believe that there was a reason to extend the work past the original boundary. Someone working on the project extended the boundary to 2300 to 2400 feet. Mr. Montgomery listed the different ways in which the work could have increased the property values of the residential lots. Mr. Montgomery had repeatedly warned appellant to be careful about working on an easement on private property, because all of the department's

work should benefit the county roads and the department. He maintained that simply because the depart-ment has an easement over private property does not mean that work has to be done.

Steve Michael Godsey, the mayor of Sullivan County, testified on behalf of appellant. Mayor Godsey recalled that around 2006, his office received two or three telephone calls regarding the Barefoot Landing area. The exit from the subdivision had a serious sight distance problem. Mayor Godsey drove to the area to verify the condition. Upon seeing the problem for himself, he asked his secretary to contact the highway department to correct the problem. Barefoot Landing was an expensive neighborhood with many exclusive homes. The subdivision had several residents with boats. Many children also lived in the area. Mayor Godsey did not view the improvement on Muddy Creek Road but noticed the improvements made by the county at Barefoot Landing/Brown Circle.

Appellant acknowledged that he and Paul Darnell were friends; however, he was not aware that Mr. Darnell was considering purchasing the land. Appellant first visited the property at the request of the mayor's office. Appellant drove by the property after the crew seeded it in 2007 to be sure that grass was growing. He noticed logging equipment along the wood line and assumed that someone had purchased it. Before the project began, appellant met David Campbell on site to instruct him regarding grading the banks. He left the remainder of the project to Mickey Nottingham's judgment.

Appellant stated that the pitch of a slope grade was determined by the topography of the land. The county must blend the grade into the existing landscape. The crew could not stop its work, leaving a vertical cut, just because the right-of-way ended. The grade would naturally reshape itself over time and cause erosion issues. The EPA required that highway departments preserve the land by seeding and/or laying straw along projects. For that reason, temporary construction easements usually last from ninety to 120 days. The highway department experienced a delay in seeding the Muddy Creek project because of the weather. Appellant received no favors or benefits from Paul Darnell for the county's work.

## II. Analysis

### A. Sufficiency of the Evidence

While appellant couches his arguments in terms of the trial court's error in denying his motions for judgment of acquittal and for a new trial on the counts of official misconduct, private use of county equipment, and theft of services more than $10,000, the crux of the issues concerns the sufficiency of the convicting evidence on the charges.

The standard for appellate review of a claim by an appellant challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e); *see State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

A criminal offense may be proven by circumstantial evidence alone. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). However, for a conviction based upon circumstantial evidence to stand, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *Id.* at 779-80 (quoting *State v. Crawford*, 470 S.W.2d 610, 612 (1971)). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 780 (quoting *Crawford*, 70 S.W.2d at 613).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## 1. Official Misconduct

The Sullivan County Highway Department's project at Graybeal Road formed the basis for appellant's indictments for theft of services more than $1,000, official misconduct, and private use of county property. The jury found appellant not guilty of theft of services more than $1,000 and guilty of the remaining two counts of the indictment. Appellant contends that the State's evidence was insufficient to establish that he acted outside of his authority or with the intent to confer a benefit to another.

While the theft of services statute prohibits one who has control over the disposition of services to others from knowingly diverting those services "to the person's own benefit or to the benefit of another not entitled thereto," Tenn. Code Ann. § 39-14-104 (2010), the official misconduct statute, however, criminalizes a public servant's "*intent* to obtain a benefit . . . to . . . another," either intentionally or knowingly, while "[c]ommit[ting] an act relating to the servant's office or employment that constitutes an unauthorized exercise of official power[.]" Tenn. Code Ann. § 39-16-402 (2010) (emphasis added). Evidence must establish that the public servant acted intentionally or knowingly; the offense may not be completed by reckless or negligent conduct. Tenn. Code Ann. § 39-16-402 (2010), Advisory Comm'n Cmts. To sustain a conviction for official misconduct, a jury must not necessarily find that another actually received the benefit, only that the public servant intended another to receive a benefit. *See* Tenn. Code Ann. § 39-16-402 (2010).

In viewing the evidence in the light most favorable to the State, we are constrained to find that the convicting evidence was insufficient to establish appellant's requisite intent with respect to the conviction for official misconduct. Testimony at trial established that appellant did not know Reed Booher prior to the Graybeal Road transaction. Jim Montgomery testified that Bud Davies, a private surveyor working with Reed Booher, approached the Sullivan County Highway Department about digging the water line ditch on Graybeal Road if Bluff City agreed to install the water line for a new development. Witnesses testified that appellant had previously engaged in business transactions with Bluff City for which Sullivan County was reimbursed and could have reasonably relied on those transactions when he expected that Sullivan County would be reimbursed for the work on Graybeal Road.

According to testimony developed at trial, the Sullivan County Highway Department was in the process of re-paving a section of Graybeal Road. The evidence established that during the course of the re-paving project, appellant saw Reed Booher on site, which could have led him to believe, pursuant to the information garnered from Bud Davies, that Mr. Booher was moving forward with developing the area on Graybeal Road and that Bluff City had agreed to install the water line for the development. Bluff City employees visited the

-18-

area to perform a water tap, which preceded installation of water lines. The State presented no witnesses to prove that anyone from Bluff City advised appellant that it would not install the water lines. Taking all of the information together, appellant authorized the highway department to dig the water line ditch. Trial testimony established that upon learning that Mr. Booher elected to hire a private contractor to install the water lines, appellant ordered the highway department to refill the ditch pursuant to OSHA regulations.

The State charged, in the presentment, that appellant intended to confer a benefit on Reed Booher by authorizing the digging of the water line ditch for Mr. Booher's development. Mr. Montgomery testified that Bud Davies's request involved a collaboration with Bluff City, not with Reed Booher. Despite conflicting evidence regarding conversations between appellant and Bluff City officials, the State presented no evidence that appellant intended to confer a benefit on Reed Booher. The jury had no evidence from which it could have inferred that appellant intended to confer a benefit on Mr. Booher. Accordingly, we reverse appellant's conviction for official misconduct and dismiss said count of the presentment.

## 2. Private Use of Public Property

The subsection of the statute under which appellant was indicted, tried, and convicted reads, in pertinent part:

> (d) Neither the chief administrative officer nor any other official or employee of the county may use any county vehicle, equipment, supplies or road materials for other than official county road purposes; however, the county governing body has the authority to authorize the county road department to perform work for other governmental entities; provided, that the cost of the projects so authorized is to be reimbursed to the county road department.

Tenn. Code Ann. § 54-7-202 (2008), *amended by* 2012 Tenn. Pub. Acts Ch. 689. While appellant points out that "[t]he evidence is uncontroverted that the water line ditch that was dug was entirely on county road right-of-way," our review does not end there; the work must also be performed for "official county road purposes."

While the Graybeal Road water line ditch was not dug for Sullivan County road purposes, the evidence at trial established the county had a history of collaborating with Bluff City on various projects. Bud Davies's request involved Sullivan County's collaborating with Bluff City. The statute in question granted appellant authority to authorize the highway department to perform the work for Bluff City, provided the Sullivan County Commission

authorized the work and the cost of the project was reimbursed to the county road department. The evidence established that appellant did not have the approval of the Sullivan County Commission prior to authorizing the digging of the water line ditch on Graybeal Road. However, the statute does not require that the approval pre-date the project. Appellant had experienced the workings of the county government in performing work for Bluff City previously and was justified in relying on the same procedure being utilized during this transaction. The State's evidence is insufficient to sustain a conviction for public use of county equipment, thus we reverse the judgment of conviction and dismiss this count of the presentment.

### 3. Theft of Property More Than $10,000 but Less Than $60,000

Appellant challenges the convicting evidence underlying his conviction for theft of property more than $10,000 but less than $60,000. "A person commits theft of services who[,] [h]aving control over the disposition of services to others, knowingly diverts those services to the person's own benefit or to the benefit of another not entitled thereto." Tenn. Code Ann. § 39-14-104(3) (2010). Viewing the evidence in the light most favorable to the State, any rational trier of fact could have found appellant guilty of this offense.

The evidence at trial was largely circumstantial and established that the Muddy Creek project began nearly simultaneously with Mr. James Paul Darnell's agreement with Ms. Cartwright to purchase the parcels of land. Mr. Darnell and appellant were friends, attended church together, and had known each other for a very long time. Ms. Cartwright received a request for permission to begin the project from the Sullivan County Highway Department before the real estate transaction with Mr. Darnell was completed. Because she had an agreement for the sale of the land with Mr. Darnell, she contacted him to obtain his consent, which he gave. Highway department crew members testified that Mr. Darnell was often present at the location, even though he did not yet own the property.

Jim Montgomery testified that he agreed that a sight distance problem existed at the intersection of Muddy Creek Road and Brown Circle. He marked a 350 to 400 foot strip of easement and confirmed with Mickey Nottingham that the grading project would not extend any farther. During a future site visit, Mr. Montgomery noted that the project had been extended to approximately 2300 to 2400 feet, which he did not believe was necessary. Mr. Nottingham confirmed that the highway department crew's grading of the slope extended well beyond the county's right-of-way. The crew graded the slopes and installed a shoulder on the side of the road. Mr. Montgomery had repeatedly advised appellant to be cautious in working on an easement and on private property.

Mr. Darnell testified that the work done by the highway department increased the value of his property. He sold a lot in the subdivision for $33,500 and did not think he could have obtained that price had the highway department not performed the work it did. He also did not have to bear the responsibility of grading both clay banks on either side of the entrance to his development. The highway department delivered two loads of dirt from the grading project to Mr. Darnell's development at Barefoot Landing.

The six-week project involved several crew members from the Sullivan County Highway Department, use of county property, and rental of private construction equipment. The cost estimates ranged from $20,963.20 to $155,760.[2] Based on the foregoing, the jury had before it sufficient evidence by which to find appellant guilty of theft of services over $10,000 but less than $60,000. He is not entitled to relief on this issue.

### B. Propriety of Appellant's Conviction for Official Misconduct Based on the Applicability of Tennessee Code Annotated Section 54-7-109

In addition to challenging his conviction for official misconduct based on insufficient evidence, appellant also questions the applicability of Tennessee Code Annotated section 54-7-109 to his case, which he claims the State relied upon in securing his conviction. Because we have reversed and dismissed appellant's conviction for official misconduct, review of this issue is moot.

### C. Restitution

Appellant argues that the trial court erred as a matter of law by failing to consider his ability to pay when it ordered restitution. As an element of sentencing, this court conducts a de novo review, with a presumption of correctness, of a trial court's order of restitution. *State v. Johnson*, 968 S.W.2d 883, 884 (Tenn. Crim. App.1997). However, we are unable to review this issue because appellant failed to include a copy of the transcript of the restitution hearing.

> It is well-settled that the duty to prepare a record which 'conveys a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal' rests on the appellant. What is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered.

---

[2] The State presented cost estimates from two local construction companies. TBI Agent Pritchard also estimated the cost of the project. While a large discrepancy exists among estimates, each estimate provided proof that the value of the services diverted was more than $10,000.

*State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005) (internal citations omitted); Tenn. R. App. P. 24(b). Operating within said boundaries, we hold that appellant has waived this issue for appellate review.

## CONCLUSION

We have thoroughly reviewed the record, the parties' briefs, and the applicable case law. We reverse and dismiss appellant's convictions for official misconduct and private use of public property; we affirm appellant's conviction for theft of property over $10,000 but less than $60,000; and we remand the case to the trial court for entry of judgments consistent with this opinion.

_____
ROGER A. PAGE, JUDGE